```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                    IN AND FOR THE DISTRICT OF DELAWARE

 3                              - - -
      ARENDI S.A.R.L.,
 4                                     :    CIVIL ACTION
              Plaintiff,               :
 5    v                                :
                                       :
 6    LG ELECTRONICS, INC., LG         :
      ELECTRONICS USA, INC., and LG    :
 7    ELECTRONICS MOBILECOMM U.S.A., INC., :
                                       :    NO. 12-1595-LPS
 8            Defendants.              :
      -----------------------------------
 9    ARENDI S.A.R.L.,
                                       :    CIVIL ACTION
10            Plaintiff,               :
      v                                :
11                                     :
      APPLE, INC.,                     :
12                                     :    NO. 12-1596-LPS
              Defendant.               :
13    -----------------------------------
14    ARENDI S.A.R.L.,
                                       :    CIVIL ACTION
15            Plaintiff,               :
      v                                :
16                                     :
      BLACKBERRY LIMITED and           :
17    BLACKBERRY CORPORATION,          :
                                       :    NO. 12-1597-LPS
18            Defendants.
                                       - - -
19
                            Wilmington, Delaware
20                     Monday, January 25, 2021
                          Telephone Conference
21
                              - - -
22
      BEFORE:        HONORABLE LEONARD P. STARK, Chief Judge
23
                              - - -
24

25
                                     Brian P. Gaffigan
                                     Official Court Reporter
```

```
1    ------------------------------------
     ARENDI S.A.R.L.,
2                                         :    CIVIL ACTION
            Plaintiff,               :
3    v                                    :
                                          :
4    MOTOROLA MOBILITY LLC f/k/a          :
     MOTOROLA MOBILITY, INC.,             :
5                                         :    NO. 12-1601-LPS
            Defendant.               :
6    ------------------------------------
     ARENDI S.A.R.L.,
7                                         :    CIVIL ACTION
            Plaintiff,               :
8    v                                    :
                                          :
9    SONY MOBILE COMMUNICATIONS (USA) INC.:
     f/k/a SONY ERICSSON MOBILE           :
10   COMMUNICATIONS (USA) INC., SONY      :
     CORPORATION and SONY CORPORATION OF  :
11   AMERICA,                             :
                                          :    NO. 12-1602-LPS
12          Defendants.              :
     ------------------------------------
13   ARENDI S.A.R.L.,
                                          :    CIVIL ACTION
14          Plaintiff,               :
     v                                    :
15                                        :
     GOOGLE, INC.,                        :
16                                        :    NO. 13-919-LPS
            Defendant.               :
17   ------------------------------------
     ARENDI S.A.R.L.,
18                                        :    CIVIL ACTION
            Plaintiff,               :
19   v                                    :
                                          :
20   OATH HOLDINGS INC., and OATH INC.,   :
                                          :    NO. 13-920-LPS
21          Defendants.              :

22

23

24

25
```

```
1    APPEARANCES:

2
                SMITH KATZENSTEIN & JENKINS, LLP
3               BY:  NEAL C. BELGAM, ESQ.

4                    and

5               SUSMAN GODFREY, L.L.P.
                BY:  JOHN P. LAHAD, ESQ., and
6                    EMI LAWSON, ESQ.
                     (Houston, Texas)
7
                     and
8
                SUSMAN GODFREY, L.L.P.
9               BY:  MAX I. STRAUS, ESQ.
                     (New York, New York)
10
                     and
11
                SUSMAN GODFREY, L.L.P.
12              BY:  KALPANA SRINIVASAN, ESQ.
                     (Los Angeles, California)
13
                     Counsel for Arendi S.A.R.L.
14

15              FISH & RICHARDSON, P.C.
                BY:  JEREMY DOUGLAS ANDERSON, ESQ.
16
                     and
17
                FISH & RICHARDSON, P.C.
18              BY:  STEVEN R. KATZ, ESQ.
                     (Boston, Massachusetts)
19
                     and
20
                FISH & RICHARDSON, P.C.
21              BY:  ANDY SCHWENTKER, ESQ.
                     (Washington, District of Columbia)
22
                     Counsel for LG Electronics, Inc.,
23                   LG Electronics USA, Inc., and LG
                     Electronics Mobilecomm U.S.A., Inc.
24                   in Civil Action No. 12cv1595-LPS

25
```

```
 1   APPEARANCES:  (Continued)

 2
                      DLA PIPER, LLP
 3                    BY:  BRIAN A. BIGGS, ESQ.

 4                           and

 5                    DLA PIPER, LLP
                      BY:  CHRISTINE K. CORBETT, ESQ.
 6                         (East Palo Alto, California)

 7                           and

 8                    DLA PIPER, LLP
                      BY:  ROBERT C. WILLIAMS, ESQ.
 9                         (San Diego, California)

10                         Counsel for Apple, Inc. in
                           Civil Action No. 12cv1596-LPS
11

12                    MORRIS JAMES, LLP
                      BY:  CORTLAN S. HITCH, ESQ.
13
                             and
14
                      McGuireWoods, LLP
15                    BY:  JASON W. COOK, ESQ.
                           (Dallas, Texas)
16
                           Counsel for Blackberry Limited
17                         and Blackberry Corporation in
                           Civil Action No. 12cv1597-LPS
18

19                    POTTER ANDERSON & CORROON, LLP
                      BY:  DAVID E. MOORE, ESQ.
20
                             and
21
                      PAUL HASTINGS, LLP
22                    BY:  ROBERT W. UNIKEL, ESQ.
                           (Chicago, Illinois)
23
                           Counsel on behalf of Motorola Mobility LLC
24                         f/k/a Motorola Mobility, Inc. in
                           Civil Action No. 12cv1601-LPS
25
```

```
 1   APPEARANCES:   (Continued)

 2
                 MORRIS NICHOLS ARSHT & TUNNELL, LLP
 3               BY:   RODGER D. SMITH, II, ESQ.

 4                     and

 5               VENABLE, LLP
                 BY:   JEFFRI A. KAMINSKI, ESQ.
 6                     (Washington, District of Columbia)

 7                     Counsel on behalf of Sony Mobile
                       Communications (USA) Inc. f/k/a Sony
 8                     Ericsson Mobile Communications (USA) Inc.,
                       Sony Corporation and Sony Corporation of
 9                     America in Civil Action No. 12cv1602-LPS

10
                 POTTER ANDERSON & CORROON, LLP
11               BY:   DAVID E. MOORE, ESQ.

12                     and

13               PAUL HASTINGS, LLP
                 BY:   ROBERT W. UNIKEL, ESQ.
14                     (Chicago, Illinois)

15                     Counsel for Google Inc. in
                       Civil Action No. 13-919-LPS
16

17               MORRIS NICHOLS ARSHT & TUNNELL, LLP
                 BY:   ANTHONY D. RAUCCI, ESQ.
18
                       and
19
                 VENABLE, LLP
20               BY:   JEFFRI A. KAMINSKI, ESQ.
                       (Washington, District of Columbia)
21
                       Counsel on behalf of Oath Holdings Inc., and
22                     Oath Inc. in Civil Action No. 13cv920-LPS

23

24

25
```

```
1                            - oOo -

2                    P R O C E E D I N G S

3               (REPORTER'S NOTE:  The following argument by

4      telephone conference was held remotely, beginning at 10:38

5      a.m.)

6               THE COURT:  Good morning, everybody.  This is

7      Judge Stark.  I'm going to have you put your appearances on

8      the record.  We'll go in order of the number of the cases.

9               First for the LG Electronics case, who is there

10     for plaintiff, please?

11              MR. BELGAM:  Your Honor, it's Neal Belgam for

12     the plaintiff in all of the cases on behalf of Arendi.  I

13     have with me on the phone, Kalpana Srinivasan, John Lahad,

14     Emmy Watson and Max Straus.

15              THE COURT:  Okay.  Thank you.

16              And you don't have to repeat that in every case

17     of course.  Good morning to you.

18              Let me ask everyone to please be on mute unless

19     you are speaking or about to speak.

20              Who is there for LG, please?

21              MR. ANDERSON:  Good morning, Your Honor.  Jeremy

22     Anderson from Fish & Richardson.  And with me are my

23     colleagues, Steven Katz and Andy Schwentker.

24              THE COURT:  Okay.  Good morning.

25              And in the 1596, who is there for Apple?
```

```
 1                    MR. BIGGS:  Good morning Your Honor, this is

 2    Brian Biggs from DLA Piper on behalf of Apple.  With me the

 3    on the line are my co-counsel, Christine Corbett and Rob

 4    Williams as well as an Apple representative, in-house

 5    counsel, Matthew Clements.

 6                    THE COURT:  Thank you.

 7                    And 1597, who is there for defendants?

 8                    MR. HITCH:  Good morning, Your Honor.  On behalf

 9    of BlackBerry, it's Cortlan Hitch from Morris James; and

10    with me I have my co-counsel, Jason Cook from McGuireWoods.

11                    THE COURT:  Okay.  Good morning.

12                    In 1601, Motorola.

13                    MR. MOORE:  Good morning, Your Honor.  Dave

14    Moore from Potter Anderson.  With me on the line is my

15    co-counsel, Rob Unikel.  We are also appearing today in the

16    Google action which is 13-919, and we are joined by a Google

17    representative, Marisa Williams.

18                    THE COURT:  Okay.  Thank you.  Good morning.

19                    In 1692, Sony.

20                    MR. SMITH:  Good morning, Your Honor.  Rodger

21    Smith at Morris Nichols for the Sony defendants along with

22    Jeffrey Kaminski from Venable.

23                    THE COURT:  Okay.  Good morning.

24                    And in 920, Oath Holdings -- 13-920.

25                    MR. RAUCCI:  Good morning, Your Honor.  This is
```

1    Anthony Raucci at Morris Nichols on behalf of the other

2    defendants along with Jeff Kaminski as well from Venable.

3               THE COURT:  Okay.  Anybody else who wanted to

4    note an appearance?

5               All right.  Thank you.  So we're here on seven

6    Arendi cases.  Plaintiff in all of them is Arendi, S.A.R.L.,

7    the first one versus LG Electronics Inc., et al, Civil

8    Action 12-1595-LPS.  The other ones are -- could I ask you

9    to put me on mute please.  There is a lot of feedback.

10   Thank you -- 12-1596, 12-1597, 12-1601, 12-1602, 13-919, and

11   15-920.

12              This is the time we set to hear argument on what

13   I believe are two related motions which broadly relate to

14   Motorola APM and then a motion brought in all seven cases I

15   believe relating to the priority of the patent.

16              I'm still getting a lot of feedback.  If you

17   all could double check that you have me on mute please, that

18   would be helpful.  Thank you.

19              I'm sure you saw the order that dealt with a

20   couple of other motions relating to the DOE.  We're not

21   going to spend our time talking about that.

22              I do want to provide you a chance for some brief

23   argument on these two motions related to the Motorola app,

24   we'll start there.

25              We are still getting some feedback.  I hope you

1    all can hear me.

2              The two motions relating to the Motorola app

3    largely overlap at least in my view so we'll hear from

4    plaintiffs first on both of those and then from the

5    defendants.

6              So whoever is there for Arendi, provided you can

7    hear me, let's see if I can hear you.

8              MR. STRAUS:  Your Honor, this is Max Straus for

9    Arendi.

10             I'm also hearing a little bit of feedback so if

11   you have trouble hearing me, please speak up and I'll try to

12   do the same.

13             THE COURT:  Okay.

14             MR. STRAUS:  Arendi timely disclosed email

15   calendar in the messaging or messages of its first computer

16   program, and Arendi repeatedly confirmed the facts remain

17   in the case.  Thus, with respect to Motorola's affirmative

18   motion to strike Dr. Smedley's reliance on those apps, we

19   shouldn't even need to reach the *Pennypack* factors so Arendi

20   would prevail under those factors.

21             In contrast, Motorola failure to engage in

22   discovery concerning these apps are accurate grounds that

23   all apps identified by Arendi were Googles apps justifies

24   the narrow targeted relief requested be Arendi in its motion

25   to strike.

1           And --

2           THE COURT:  Let Me -- yes, let me interrupt

3    you.  We looked very carefully as these two motions.  It

4    looks to me, I could be -- I could of course be wrong, I'm

5    sure you will think I am, but it looks to me like there was

6    a misunderstanding here.  It looks to me like both sides

7    didn't ask the direct question they needed to ask to resolve

8    that misunderstanding.

9           I apologize for that feedback.  I hope you can

10   hear me.

11          My question really to both sides starting with

12   plaintiffs of course is if I, if I think there is a

13   misunderstanding, why shouldn't I just, you know, in the

14   context of this case, let you do whatever discovery of

15   fact and expert discovery you need to resolve the prejudice.

16   There is time because we don't have a trial date.

17          I mean the idea of not -- now that we know there

18   is source code, the idea that we still present infringement

19   case without looking at the source code seems like an odd

20   resolution.

21          On the other hand, not letting you all make the

22   allegations that it seems you have never dropped from the

23   case also seems like an odd outcome.

24          So what is the plaintiff's view on that?

25          MR. STRAUS:  So I think if the proposal that the

1   Court is making is that discovery be reopened and we sort of

2   go back a year in time and submit additional expert reports,

3   I think from our perspective the cases have been pending

4   since 2012 and a great deal of time and effort in resources

5   have already been invested in these cases.  And we believe

6   that we have sufficient evidence to move forward on these

7   cases and, quite frankly, that Motorola did as well and know

8   that Google wrote in its reply report in response to our

9   affirmative motion -- I'm sorry, that they wrote in their

10  reply report in support of their affirmative motion that

11  Dr. Rinard lacked access to necessary code.  But quite

12  frankly in his report, Dr. Rinard wrote that he relied on

13  the Motorola source code.

14          So from our perspective, we have the information

15  that we need to go ahead, provided there is very limited

16  relief we're requesting.  And I think that Motorola has

17  shown that it has adequate information as well.

18          THE COURT:  Right.  But am I right, you're

19  asking me not to permit their expert to state opinions based

20  on the source code that we now know exists with respect to

21  these Motorola apps?  Is that right?

22          MR. STRAUS:  Not at all.  Not at all.  The

23  request that we put forward in this outline in the proposed

24  order is specifically and intentionally narrow.

25          We have no problem with Motorola's expert

1    challenging the accuracy of our expert's code traces.  We

2    have no problem with Motorola's expert opining that those

3    code traces don't in fact support the theory of

4    infringement.  The specific relief that we've requested is

5    directed toward preventing Motorola's expert from making

6    unfair advantage of the misstatements during this case.

7              So, for example, Motorola is here today arguing

8    that our reliance on the messages app on the Motorola G6

9    should be struck because it is in fact a Motorola app.

10             If we look at Dr. Rinard's report, their

11   expert's report, Dr. Rinard is arguing that our expert

12   improperly relied on source code from Motorola because that

13   same app is in fact a Google app.

14             We have been -- because we were deprived the

15   opportunity to engage in document discovery in depositions

16   of their technical witnesses that could have resolved these

17   things, that is an issue that, that we don't think they

18   should be able to take advantage of.

19             As another example, their expert has opined that

20   our expert has failed to show that certain source code is

21   actually executed.  Not that the traces are necessarily

22   wrong but that we haven't shown that it's actually executed

23   on the devices.

24             That again is something that could have easily

25   been cleared up in a deposition and isn't something that we

1    think is fair for Dr. Rinard to make hey of at this stage of

2    the case.

3              THE COURT:  Okay.  Well, so he -- you would

4    permit Dr. Rinard; even if I grant the relief you want,

5    Dr. Rinard can rely on some of the Motorola source code,

6    just not all of it?

7              MR. STRAUS:  Correct.

8              I don't think that is how I would phrase it.  I

9    think the way that I would phrase is it that Dr. Rinard is

10   certainly permitted to challenge the accuracy of our

11   expert's understanding of the source code that was produced,

12   whether the code was correctly read, correctly interpreted

13   and whether that code in turn supports or does not support

14   the proposition that certain claim elements are practiced

15   when that code is executed.

16             THE COURT:  Okay.  Well, that sounds to me like

17   that is a different answer than to what you answered me

18   first.  Are you asking me to say Dr. Rinard can't rely on

19   the Motorola source code that we all now know exists?  Is

20   that -- is the answer to that yes or no?

21             MR. STRAUS:  The answer to that is that

22   Dr. Rinard may, may rely on that source code with the narrow

23   limitations that we proposed.

24             THE COURT:  All right.  Let me hear from the

25   defendants on this before we go any further.

1          And, again, I'd ask everyone please put me on

2    mute, if you can.  It's clear that somebody has not muted

3    us.  I'm getting a lot of feedback.

4          But whoever is going to speak for the defendants

5    on these Motorola apps motions, tell me which is your

6    reaction to what I'm proposing about reopening discovery on

7    these points.

8          MR. UNIKEL:  Your Honor, this is Rob Unikel of

9    Paul Hastings on behalf of Motorola.

10         First, can you hear me, Your Honor?

11         THE COURT:  I can.  Thank you.

12         MR. UNIKEL:  Great.  Your Honor, in answer to

13   your question, there is two fundamental points that I need

14   to make.

15         No. 1 is we did offer Motorola witnesses for

16   deposition, both 30(b)(6) and 30(b)(1).  Arendi declined

17   those deposition for whatever reason.  And had there been

18   any confusion about whether or not there was Motorola code

19   or whether or not Motorola apps were somehow being excluded

20   if they had simply taken depositions of our technical

21   witnesses, this would have been abundantly clear.

22         And, No. 2, in the correspondence about the

23   contentions that we had with Arendi at the beginning when

24   Motorola was creating questions and issues about the

25   contentions that were provided, you can see in the exhibits

1    we provided, particularly Exhibit D to our motion, which is

2    this correspondence of April 15th, 2019, where we record our

3    agreement with Arendi that their earlier contention, the

4    2013 contentions that they're now pointing to could not, by

5    agreement of the parties, apply to any product sold after

6    December 2013 or to any product that runs a version of

7    Android after Android 4.

8              So that was the agreement that the parties came

9    to, to prevent us from filing motions to compel additional

10   contentions or to strike the additional contentions.  And

11   that is recorded in the correspondence.

12             The big issue that we have now is apparently

13   they want to, they want to accuse devices that were sold

14   after December 2013 and that run versions of Android 5, 6,

15   7, and 8 that include the Motorola apps.

16             And by our agreement, that was not permitted.

17   It is not permitted, and there is no contentions from after

18   the 2013 contentions, so nothing in 2018 when they filed

19   their new contentions and new accused devices that accuse

20   any Motorola apps.

21             In fact, everybody agrees that in the 2018

22   contentions, the only apps that were accused are Google apps

23   that are running on Motorola devices.

24             THE COURT:  All right.  Well, you can straighten

25   me out, but it doesn't seem like it's that simple.

1          They say -- I apologize.  I'm still getting

2     feedback, but you can hear me, Mr. Unikel?

3          MR. UNIKEL:  I can.  Thank you, Your Honor.

4          THE COURT:  They say they were always accusing

5     preinstalled apps which as I understand it could include

6     Google and could include Motorola apps.  They clearly

7     accuse Motorola apps back in 2013, I think it was.  And

8     they understood your side consistently telling them that you

9     didn't have anything on the Motorola apps and they had no

10    way of knowing that there was any distinction that you were

11    going to make ultimately between the Motorola and the Google

12    apps.

13         So I mean where do I have that analysis wrong?

14         MR. UNIKEL:  The analysis, Your Honor, I think

15    breaks down where the contentions are involved.

16         So in the 2018 contentions, there was no

17    accusation against the Motorola apps.  Every app that is

18    listed, charted, accused is a Google GMS app.

19         They're pointing now --

20         THE COURT:  Well, hold on.  Hold on.  Hold on.

21         What can you point to that shows that they were

22    aware that they were only charting a set of Google GMS apps

23    and thereby excluding Motorola apps as opposed to charting

24    what you all agreed to be charted, what you all based in

25    part on the representative phones used to do?

1            I mean where can you point to that they

2   understood that the Motorola apps were different than the

3   Google apps and therefore they were effectively disclaiming

4   any further allegations against Motorola?  I'm missing

5   that.

6            MR. UNIKEL:  So, Your Honor, the two places I

7   would point to you are first is -- and this is Exhibit D to

8   our -- which is in March of 2019, we sent them a letter

9   about the contentions indicating our concerns about the

10   contentions and the lack of certain disclosures in the

11   contentions.  And on page 3 of that letter, we list the

12   exact combinations that were accused in the 2018 contentions

13   and that we consider to be the accused apps in the case.

14            If you look at the list of those combinations,

15   it is all Motorola devices and Google apps.  We state in

16   that letter that based on our understanding of the

17   contentions, that these are the only combinations that are

18   accused in the case, and we still have concerns about their

19   failure to chart certain aspects of those combinations.

20            We then agreed with them that to cure those

21   problems, the contention that those combinations, they

22   could submit more complete charts with regard to four of the

23   Google apps instead of all of the Google apps that they had

24   included in the combinations, and they then went ahead and

25   did chart those Google apps.

1          In multiple correspondence that followed,

2     including all of the correspondence that Arendi cites in its

3     motion papers, we repeatedly said to them throughout the

4     case, the source code for the accused apps, Motorola doesn't

5     have.  And we said repeatedly the reason Motorola doesn't

6     have the source code for the accused apps is because we

7     received it from Google, which is of course only possible if

8     we're talking about the Google apps.

9          And again at no time did they say to us, well,

10    we need a deposition, for example, because we don't

11    understand how you could not have code for your own apps.

12    And the reason was because it was always the Google apps

13    until expert reports.

14          THE COURT:  But why can't it -- I mean what

15    rules out the possibility that they thought you were saying

16    the Google apps and the Motorola apps are the same, they

17    run on the same source code, and/or for some other reason,

18    you know, you outsourced the development I suppose of the

19    Motorola apps, and for whatever reason you were stonewalling

20    and just saying we don't have, we're not going to get our

21    own Motorola source code?

22          I mean again, it looks -- I don't see where you

23    specifically say the Goggle apps and the Motorola apps,

24    which we recognize you, you independently and separately

25    accused at the outset of the case, they are two different

1    things.  They have two separate sets of source code.  We've

2    got the Motorola ones, but we understand you not to be

3    accusing them any more.  Please let us know if we're wrong.

4    And we don't have any Google source code but we recognize

5    you're alleging infringement of Google.

6            I mean where is something with that level of

7    clarity that rules out the possibility that the plaintiff

8    was acting in good faith and simply misunderstood what you

9    were telling them?

10           MR. UNIKEL:  Your Honor, I cannot point to

11   something that has the clarity and completeness of what you

12   just described in part because this was obviously an ongoing

13   discussion that was revolving around the lack of clarity in

14   the contentions.

15           What I can say is in that April 15th, 2019

16   letter, we specifically memorialized the agreement that

17   the earlier contentions, which are the only contentions that

18   mention the Motorola apps, were going to be limited to

19   products from December 2013 and before and to versions of

20   Android, 1 through 4.

21           And what I can tell Your Honor is that was the

22   agreement.  That was because those contentions were the only

23   contentions that mentioned any Motorola apps.  And if what

24   Your Honor is saying is that at this point, they should be

25   permitted to get discovery if they want it on devices that

1    were in existence before December 2013 or that ran Android's

2    versions 1 through 4 consistent with our agreement, then I

3    could understand that.

4              But they, at the end of the day, this is their

5    case.  They are the plaintiffs.  They took none of the

6    discovery of Motorola witnesses.  They didn't take a single

7    technical 30(b)(6) witness of a Motorola representative to

8    ask about source code or Motorola apps or the difference

9    between Google apps and Motorola apps.  And at the end of

10   the day it is their case to have prosecuted.  And if they

11   didn't prosecute it, which we don't believe they did, I'm

12   not sure that they should be entitled to a do-over two years

13   after fact discovery, you know, was opened.

14             THE COURT:  When they said that they were

15   accusing of infringement preinstalled apps, was that a term

16   that was limited to GMS apps?

17             MR. UNIKEL:  That is what we understood from the

18   contentions.  Based on the correspondence where we indicated

19   to them the combinations of preinstalled apps and devices

20   that were in the contentions and that were in the charts.

21   There are many preinstalled apps, for example, Your Honor,

22   that have nothing to do with the case.  And, obviously, we

23   didn't assume that all preinstalled apps, regardless of

24   whether or not they were charted or not, were fair game.

25             THE COURT:  All right.  What do you understand

1    to be the scope of the relief that plaintiff is seeking with

2    respect to I think it's Dr. Rinard's use of source code?

3              MR. UNIKEL:  I must confess, Your Honor, I don't

4    know the answer to that question.  I'm confused by what it

5    is that they wish to preclude Dr. Rinard from commenting on.

6              Clearly, he needs to have the ability to respond

7    to their, to their allegations and analyses in the expert

8    report of Dr. Smedley.

9              Obviously, that would have to be done factually

10   accurate with respect to the actual Motorola apps, so I'm

11   not really sure what they were proposing that he should be

12   precluded from speaking about.

13             THE COURT:  And if I were to, if I were to

14   permit further discovery on this, I think what you are

15   saying is, you would ask me to consider limiting it to

16   anything relevant to the Motorola apps through 2013 and

17   Android 4; is that right?

18             MR. UNIKEL:  Correct, Your Honor.

19             THE COURT:  And if I did that, do you have any

20   sense as to how much time, how much effort, how much expense

21   would be involved in reopening discovery on that point?

22             MR. UNIKEL:  I guess it depends on how broadly

23   discovery were to reopen on that point.

24             If it were purely restricted to, you know,

25   review of code, to the extent that that could be done, I'm

1    not sure how easy or difficult that would be to collect.

2    Obviously, we would be dealing with old code.

3              So we'd just deal with how quickly and easily we

4    could get that code collected, and then perhaps if there

5    was, you know, one 30(b)(6) deposition about how those

6    worked, that obviously would limit the amount of discovery.

7    If it was a full open season on, you know, discovery going

8    back to those apps, which obviously nobody thought was in

9    the case before now, it could be a bigger and more expensive

10   effort.

11             THE COURT:  Right.  Okay.  I'll come back to

12   you, but let me turn it back to plaintiff at this point.

13             If you would, respond first to the point that

14   you did clearly agree that you were not going to be

15   proceeding with alligations against, you know, the products

16   after 2013 or versions Android after 4.  Respond to that,

17   please.

18             MR. STRAUS:  Absolutely.  Thank you, Your Honor.

19             So counsel has referred a few times to an email

20   of his from April 15th.  That email did state that it was

21   his understanding that the 2013 contentions ended in 2013.

22   He has neglected to mention a second e-mail that was sent

23   the following day by counsel from Arendi on April 16th which

24   we have cited to in our letters and is included in Exhibit

25   D.  And that e-mail makes clear 2013 is not a meaningful

1    cutoff, and the cutoff, what was intended is that the, the

2    charts that were served in 2013 applied to the products

3    that were charted in 2013.  So, for example, the chart that

4    covered Android version 4 applied to devices running Android

5    4, whether those devices were released before or after 2013.

6              And we did not receive any response, or any --

7    about that from opposing counsel.  So that is not something

8    that I think was accurately conveyed during his argument.

9              The second related point is that regardless of

10   that 2013 cutoff, the expert reports in this case really

11   only deal with two devices.  A representative Moto X and a

12   representative Moto G6.  And pursuant to Motorola's own

13   stipulation, the Moto X which was running Android 4.2.2 was

14   declared to be representative of the functionality of all of

15   the accused devices running versions of Android prior to

16   version 8.

17             And so what I understand counsel for Motorola to

18   be trying to do now this morning is, is to renege on that

19   stipulation and say, well, no, actually that device is only

20   representative of devices that are running Android version 4

21   and earlier.

22             And that, quite frankly, is unfortunately not

23   what we agreed to.

24             The other points that I would like to make in

25   response to counsel are that, first of all, there was a meet

1     and confer between myself and counsel for Motorola on

2     October 16th of 2019 regarding the scheduling of

3     depositions.  And we specifically discussed during that

4     time, Motorola discussed X and the availability to take

5     technical depositions.  And on that call as well as in

6     many other calls, there was correspondence and discovery

7     responses, I was told yet again there was no, there was no

8     code, there was no meaningful technical knowledge about

9     individual apps because they're all Google apps.

10              And the premise for Google's -- sorry.  The

11    promise for Motorola's argument that we should have known

12    it's not what they meant, that we should have known better,

13    has to be that there is some way on the face of these -- on

14    the face of these devices, to know whether we're talking

15    about a Motorola app or whether we're talking about a Google

16    app but in fact that's not the case.

17              These devices, if you pick up a Moto X and if

18    you look at the claim charts we have included as exhibits

19    to our letter briefs, the apps are labeled as email,

20    calendar, messages, messaging.  They're not labeled as

21    Google calendar, Motorola calendar.  The Google Motorola

22    distinction is not a distinction that we ever made.  It's a

23    distinction that Motorola is now making long after discovery

24    closed.

25              And then finally, the 2019 contentions I really

1    don't think are read fairly as limited to Google apps.

2              For example, we accuse on those devices we

3    depict on a Moto G6, which again is exactly the same device

4    at issue in these reports, messages.  And if you look at

5    the caption, if you look at the written description, it

6    doesn't say Google messages, it says messages.  And without

7    the benefit of the very discovery we were deprived of,

8    there was no way for us to know whether we were talking

9    about Google messages or Motorola messages.  What mattered

10   for our purposes is we were going after the preinstalled

11   messages app on these devices.

12             And so there, I don't think it really was just a

13   misunderstanding.  I do think that at a minimum, Motorola

14   knew that the 2013 charts were at issue in this suit at

15   least at a minimum with respect to the devices prior to 2013.

16             They have -- even today, they're not contesting

17   that Motorola apps were installed and were charted in the

18   2013 charts with respect to those devices.  And so that

19   really raised the question why was no Motorola technical

20   material, why was no Motorola app material ever produced to

21   us in this case, and why were we repeatedly told that all

22   apps at this issue were Google apps?

23             And there frankly was no way for us to know

24   whether they were Motorola or Goggle apps until we received

25   Dr. Rinard's report this past October.

1          THE COURT:  You had access to some source code,

2    I believe.  Why would that not have been sufficient for your

3    expert to realize previously that there was a distinction

4    between the Google and the Motorola apps?

5          MR. STRAUS:  So Motorola produced two source

6    code or produced a source code computer with two sets of

7    files on it.  That computer did include some app code as

8    well as some OS code.  It included app code for apps that

9    weren't on the representative devices.  It included source

10   code for some apps that were at least in the same class as

11   what we found in the representative devices.

12         We were repeatedly told by counsel, including on

13   a call on a July 28th of just this summer, that the code on

14   those devices was not the code that was used to produce the

15   apps actually installed on these devices, and that the codes

16   that was there was irrelevant.  He didn't know why it was

17   produced.  I frankly at the time was unsure why it was

18   produced.

19         The reason why it is discussed in the report,

20   if you look at the source code appendix to Dr. Smedley's

21   expert, first expert report, it's because when Dr. Smedley

22   went in and looked at this code, he saw that it materially

23   aligned with some of the operation of the apps at issue on

24   these devices and therefore was, was helpful additional,

25   buttressing evidence for his opinion of infringement.

1          He also discussed publicly available published

2     source code, AOSP source code, which is it's both similar to

3     some of the code that he discussed in the apps and also he

4     saw materially aligned with the, with the operation of the

5     produced representative devices.

6          What he wasn't able to say is that this is the

7     source code for the apps.  And even this morning on the

8     call, I don't understand counsel to be saying that the code

9     they produced was the source code for the apps.  He just

10    told us he would have to go back and investigate what other

11    app code has to be aggregated for us to review.

12          MR. UNIKEL:  Your Honor, this is Rob Unikel.

13    May I offer a quick response?

14          THE COURT:  Yes, go ahead.

15          MR. UNIKEL:  What I can say is that if this was

16    coming up in the context of a motion to compel or a motion

17    for protective order in the middle of fact discovery, that

18    might be one thing.

19          Fact discovery closed more than a year ago.  And

20    this, you know, as part of Arendi's case, which they, you

21    know, were pursuing in fact discovery for multiple years, if

22    there were questions about what code they had and what code

23    they didn't have, they could have raised those to us to be,

24    to be more clear.

25          If they wanted to take a deposition of

1    Motorola's people to understand what exactly were the apps,

2    who designed the apps, who has the code for the apps, they

3    could have done any of that.

4         The fact that they did not pursue any of that

5    during fact discovery and then just tried to add these

6    things in during expert reports is the problem from our

7    perspective.  And in sort of to use the baseball term "tie

8    goes to the runner," it seems to me that if the party with

9    the affirmative burden of pursuing their case, which is

10   Arendi here, didn't clarify the issues, didn't take any of

11   the depositions they needed to, didn't pursue any of the

12   source code, that it becomes kind of too late and that falls

13   on their shoulders.

14        That being said, you know, we did produce the

15   code that we thought was relevant to produce the

16   representative devices, which we did.  We certainly didn't

17   withhold things or try and obscure things.  If there was any

18   miscommunication or misunderstanding on Arendi's part, I do

19   believe that burden falls to Arendi.

20        THE COURT:  But, you know, I appreciate that

21   argument, but it's full of problems as well.  I mean you all

22   were repeatedly clear that you had no source code to produce

23   with respect to the Motorola apps.  Why should the plaintiff

24   have assumed that you're making a misstatement?  What would

25   have put them on notice to think that they needed to take a

1    deposition, a 30(b)(6) deposition of Motorola to find out

2    if what counsel were telling them, hey, we don't have any of

3    this source code, to find out if that was true?

4           I mean, I still have not seen where I can point

5    to to say plaintiff was acting in somewhat bad faith and

6    knew that the Motorola apps were not in the case and knew

7    that it was nonsensical to be told that Motorola didn't have

8    Motorola source code?

9           I mean they took you at your word that you, you

10    didn't have this stuff, so it's hard for me to see why I

11    should just tell them I needed to do more to test out what

12    you were representing.

13           MR. UNIKEL:  Your Honor, all I can say on that

14    is that the comments that they're pointing to where they say

15    we didn't have the source code were always clear that the

16    reason we didn't have the source code was because those, the

17    apps they were referring to, were the Google apps.  At no

18    point did we say to them we don't have Motorola code for

19    Motorola apps.

20           And I am not aware of any instance where we would

21    suggest that we did not have Motorola code for Motorola apps.

22    Everything was always about the Google apps precisely because

23    as we understood, the agreement with them early on for the

24    contentions as well as the substance of their contentions, it

25    was only the Google apps that were ever being explored during

1    discovery during the case.

2              THE COURT:  It looks like you did think that,

3    but again, at best your argument is, you know, plaintiff

4    effectively dropped the Motorola apps from the case.  I

5    mean you're candid in your letter briefing that it was an

6    effective dropping, and I just, I don't see where they

7    dropped it and you all have a, you know, it seems like,

8    good faith disagreement about what you were comprising on

9    that led to these representative claim charts and the

10   representative products.  The representative products have

11   the Motorola apps on them.  And the plaintiffs say they

12   couldn't tell whether they were at the time, you know, from

13   a user interface basis, Motorola or Google apps.

14             I don't think you disagree with that, do you?

15             MR. UNIKEL:  I think that had they spent any

16   time looking into it, Your Honor, that they would have seen

17   that they were, the distinction between Motorola and GMS,

18   Google GMS apps, I don't believe they did even the most

19   basic exploration to find out that difference.

20             But can I say what was in their mind?  I cannot,

21   Your Honor.

22             THE COURT:  All right.  Is there anything else

23   you want to add?

24             MR. UNIKEL:  The only thing -- sorry.  The only

25   thing I would add, if the Court is inclined to order

1    anything further here I would ask, A, that it be restricted

2    as we have discussed and agreed upon to, you know, any

3    Android devices running Android 1 through 4 and before

4    December 2013 and, No. 2, that if there is additional

5    discovery, at least it be limited so that this doesn't

6    become just a completely redo of discovery again, and that

7    it doesn't -- the expense of it just doesn't overtake what

8    has already been an incredibly long process.

9                THE COURT:  What about the correspondence that

10   followed up on the one that you pointed me to, that

11   plaintiff counsel was last referring to, that seems to shed

12   a different light on what may have been agreed to?  Can you

13   respond to that?

14               MR. UNIKEL:  Yes, Your Honor.

15               That follow-up correspondence said that

16   essentially they were devices that were produced before

17   December 2013; for example, that used Android version 4.

18   That those would still be subject to the suit, which we

19   understood, right?  A device was produced in December 2013

20   and didn't get sold until the next, early the next year, for

21   example.  Because it was in inventory, we understood why

22   that would be included with what was being accused, or

23   similarly if was an Android 4 phone that was produced in

24   December or November 2013, we understood why that would also

25   be encompassed, because it's the same version of Android

1    subject to the same contentions, but that was essentially to

2    just eliminate those corner cases.

3              That was not to say the agreement on limiting it

4    to Android 4 or before December 2013 and before was meant to

5    throw out the limitations altogether and open it up to every

6    product that came after.  That is the exception as well as

7    the rule, and we certainly didn't understand them to be

8    suggesting that when we agreed to the limitation on the

9    earlier contentions.

10             THE COURT:  All right.  I failed to write down

11   plaintiff's counsel name.  What was your name again, please?

12             MR. STRAUS:  Max Straus.

13             THE COURT:  Right.  Okay.  Do you want to add

14   anything?

15             MR. STRAUS:  Just that while I would need to

16   consult with my counsel, I think in light of the

17   representative products stipulation from Motorola, that if

18   the Court does see fit to order additional discovery, it be

19   limited to the two representative products at issue.

20             I actually don't think there is any reason to

21   take additional discovery on Android devices running

22   Android's version 2, 3, 4 when we know the exact two devices

23   that are going to be issue at trial.

24             THE COURT:  All right.  Well, thank you.

25             I am going to give you, that is, plaintiffs and

1   Motorola, a chance to figure out what discovery needs to be

2   taken because as I think is probably clear from our now

3   lengthy discussion, I have not been persuaded that this is

4   anything other than an unfortunate misunderstanding between

5   the parties as to whether the Motorola apps are in the case

6   or out of the case.

7        I don't see anywhere clearly that plaintiff

8   removed their allegation from the Motorola app from the

9   case.  I don't see anything clearly that shows that

10  plaintiff understood that the representations that were

11  being made by the defendant or the compromises that were

12  reached meant that the Motorola apps were out of the case.

13       Saying all that, I don't mean to suggest that

14  I think that the defendants are acting in bad faith here.  I

15  think they believed that the Motorola apps were out of the

16  case, and they believe now that the plaintiff should have

17  known that, if not, did not.  In fact, either should have

18  known it or may be even did know it.  Again, they haven't

19  persuaded me that the plaintiff should have known it or did

20  know it, but they have persuaded me that they, the

21  defendants, believe that is true of the plaintiff.

22       It is just a long convoluted perhaps way of

23  saying, I'm not persuaded under *Pennypack* or any other

24  analysis that I should now say the Motorola apps are not

25  accused of infringement and are dropped from the case.  But

1    I also am not persuaded under *Pennypack* or any other

2    analysis I should say that the defendants' expert, for

3    instance, should be hamstrung in defending against an

4    infringement allegation of the Motorola apps by, for

5    instance, not being able to rely on all the source code

6    that he is aware of.

7             So unfortunately, and it is unfortunate because

8    I recognize no party wants me to do this, and candidly I

9    don't want to do this, but I see no better alternative to

10   saying there has got to be further discovery or, or some

11   other way to ameliorate the prejudice that I see to both

12   sides from the situation that has resulted.

13            So I'm directing you all to meet and confer.  I

14   can give you until the end of this week to get back to me

15   with a joint letter that sets out -- I will be hopeful --

16   a joint proposal as to what, if any, discovery is needed in

17   terms of fact discovery, in terms of expert discovery, in

18   terms of a 30(b)(6) deposition, in terms of an expert

19   deposition or expert reports.  Those are all possibilities.

20   I'm not closing the door to anything.

21            I'm not ordering anything other than that you

22   put your heads together in good faith, see if you can agree

23   on how to get out of this mess, and if you can't, then give

24   me in the letter Friday your specific proposal for how to

25   get out of this mess.  And I'm going to do my best just to

```
 1    pick the one that seems most reasonable overall, and hope
 2    that I'm able to discern which one is most reasonable
 3    overall.  I can't do any better than that at this point.
 4              Any questions about that or any more to say
 5    about this, Mr. Straus?
 6              MR. STRAUS:  None from me.  Thank you, Your
 7    Honor.
 8              THE COURT:  Mr. Unikel?
 9              MR. UNIKEL:  None, Your Honor.  Thank you.
10              THE COURT:  All right.  Thank you.  Let's use
11    our remaining time to address the other motion that has to
12    do with priority date.  I believe all of the cases have
13    this motion filed in it.  It's a defense motion to strike.
14              Let me hear from whoever is going to represent
15    the defendants on this, please.
16              MR. UNIKEL:  Your Honor, this is Rob Unikel
17    again for Google and Motorola.  I'll be arguing for all
18    defendants with respect to this motion to strike.
19              THE COURT:  Okay.
20              MR. UNIKEL:  Your Honor, I'll be relatively
21    brief.  I know we have spent a lot of time already.
22              I want to start with one overarching point of
23    clarification, and that is that conception and invention
24    date are typically raised for two possible reasons as the
25    Court is well aware.
```

1          One is more generally to provide context and the

2     invention story at trial.

3          And No. 2 is as a declaration or an anchor for

4     priority date.

5          And to be clear, we're not saying that Arendi

6     should be precluded from presenting its general invention

7     story and the history of this particular patent, the '843

8     patent, in a general way.

9          What we're saying is that Dr. Sacerdoti in his

10    report actually uses a newly identified invention date of

11    July 6th, 1997 and then tries to use it as a priority date

12    in order to disqualify certain prior art under Section

13    102(a).

14          A few critical facts are not in dispute.

15          The first one is that at no time prior to Dr.

16    Sacerdoti's opening expert report did Arendi ever identify

17    July of 6th, 1997 as the invention date.  In fact, at that

18    time --

19          THE COURT:  Hold on.  Okay.  Hold on.

20          Did they identify "July 1997" and/or "summer

21    1997" as the invention date previously?

22          MR. UNIKEL:  No, Your Honor, not as to the '843

23    patent.  The most that was disclosed is in interrogatory 9

24    which was our interrogatory, defendants' consolidated

25    interrogatory asking for an identification of priority date.

1    They unequivocally stated that the priority date

2    for the '853 family was September 3rd, 1998.  As part of the

3    answer, they said there was conception of the entire '853

4    patent family in the summer of -- at least as early as the

5    summer of 1997.

6    At no point did they modify the unequivocal

7    statement about priority date to suggest that they were

8    claiming priority date to any summer of 1997, July 1997, or

9    July 6th, 1997 date.  At no time did they ever indicate

10   that they were claiming priority for any date other than

11   September 3rd, 1998.  And at no time did they ever

12   specifically say as to the '843 patent claims that they were

13   claiming a summer 1997 or July 1997 conception date because

14   there, obviously to do to that you have to have

15   corroborating evidence but evidence that corroborates as to

16   the elements of the claim.  And frankly that is absent from

17   the material they cited even in the Sacerdoti report, which

18   is why we understood they might have been offering the

19   summer 1997 date as part the invention story generally, but

20   they were definitively declaring September 3rd, 1998 as the

21   priority date.

22   THE COURT:  Well, is that statement in response

23   to your interrogatory really as unequivocal as you say it

24   is?  It covered more than just the one patent we're now

25   talking about, it covered a family of patents; right?

 1           MR. UNIKEL:  The, the statement covered a family

 2     of patents, correct, Your Honor.

 3           THE COURT:  And it said as least as early as

 4     September -- or did it -- The September 1998 date, did it

 5     have any qualifier on it?

 6           MR. UNIKEL:  No, Your Honor.  I'm reading the

 7     statement right now from the interrogatory.  "All patents

 8     in the '853 patent family are entitled to priority to the

 9     Norwegian patent application 984066 filed on September 3rd,

10     1998".

11           THE COURT:  Thank you for that.  I found that

12     now.  I appreciate that.

13           So why can't that be read as here are multiple

14     patents and each of them is entitled to priority of

15     September 3rd, 1998, and some of them, including one we're

16     now concerned with, may be entitled to an earlier date?

17           MR. UNIKEL:  Your Honor, that statement says

18     that all patents in the '853 family, which includes

19     necessarily the '843 patent, are entitled to that priority

20     date.  That is not a -- and it could be possible there's

21     other priority dates.  There's no equivocation in that

22     language.

23           And frankly, Your Honor, throughout the course

24     of the -- of all the fact discovery, invalidity contentions,

25     the expert reports, there was no suggestion that they were

1    amending this to declare and earlier priority date.  We

2    never received a supplemental response despite numerous

3    requests for them to supplement, if they felt it was

4    necessary, their interrogatory answers.

5           We received no indication of any kind prior to

6    the expert report that they were altering their priority

7    date declaration here.

8           This is about as unequivocal as you can get in

9    terms of what priority date they're claiming for the '853

10   patent family.  And it is not just a family generally, it is

11   all patents in the family.

12          THE COURT:  So if I grant your motion, would I

13   be permitting them nonetheless to tell an invention story

14   that says we conceived of this -- I think it's the '843, the

15   one we're talking about -- we conceived of this patent on or

16   about July 6th, 1997?  Did you have any problem with that?

17          MR. UNIKEL:  No, Your Honor.  The critical issue

18   here is that the opinion offered by Dr. Sacerdoti is not

19   just to present the invention story.  They're actually

20   trying to disqualify prior art under 102(a) because now

21   they're saying we actually conceived of all elements of the

22   invention on July 6th, 1997.

23          And the key obviously is with that is there is

24   a significant amount of relevant art from early 1998 before

25   the September 3rd, 1998 date which they're attempting to

1   disqualify by this new invention date.

2            But if all they're planning to do is to tell the

3   story of generally how did this invention come about, what

4   was the timeline of it for purposes of filling in the

5   context of the anywhere, at least for Google and Motorola, I

6   don't believe we would have any objection to that.  It's

7   really just to see if they're going to use it to try to

8   disqualify prior art under 102(a).  That is where the rubber

9   meets the road so to speak.

10            THE COURT:  And as I think the answer is the

11   same if they wanted the to say July 6th, 1997 specifically

12   as opposed to just summer.  And I may have said the wrong

13   year, I'm sorry, but as opposed to summer or July generally.

14            If it's just the conception date and not

15   changing the priority date, do defendants have any objection

16   to a specific date of conception?

17            MR. UNIKEL:  Again, from Google and Motorola's

18   perspective, and I believe for the other defendants

19   perspective, if that was not a 102(a) date, in other words,

20   if that was not being used as a specific date for the

21   purposes of disqualifying prior art under Section 102(a)

22   and just as an identification of the date for contextual

23   purposes, I would not have an objection to that.  It's only

24   if it's being used to disqualify prior art where it becomes

25   more significant, Your Honor.

```
 1                    THE COURT:  Okay.  Let me pause and see if any

 2    defendants disagree with that.

 3                         (Pause.)

 4                    THE COURT:  Silence is fine.  I'll take silence

 5    as I agree.

 6                         (Pause.)

 7                    THE COURT:  Okay.  I'm going to assume you were

 8    speaking for everyone on that.

 9                    We'll come back to you, Mr. Unikel.  But let me

10    hear from the plaintiffs at this point.

11                    MS. LAWSON:  Good morning, Your Honor.  This is

12    Emi Lawson from Susman Godfrey on behalf of Arendi.

13                    THE COURT:  Yes, sorry.  I cannot hear you.

14                    MS. LAWSON:  Sorry, I'll speak up.

15                    Good morning, Your Honor.  This is Emi Lawson of

16    Susman Godfrey on behalf of plaintiff.

17                    THE COURT:  Okay.

18                    MS. LAWSON:  So I'd like to address a couple of

19    things Mr. Unikel, you know, raised.

20                    The first is that I think Your Honor's

21    understanding of the interrogatory response is more

22    consistent with Arendi's position and that while the

23    September 1998 date was identified, that wasn't a limiting

24    date.

25                    Arendi has been consistent in its assertions
```

1    regarding conception throughout the course of, throughout

2    the course of litigation.  And Dr. Sacerdoti's

3    identification of July 6th specifically of 1997 continues to

4    be consistent with Arendi's position throughout this case.

5            Now, it seems that defendants are willing to

6    accept July 6th, 1997 as a conception date if it is not

7    relied on for the purposes of establishing a priority date,

8    which from our, from our perspective implies a date except

9    that they have been put on notice and July 6th or July of

10   1997 has been identified as the date of conception.

11           Now, if there is a dispute as to the sufficiency

12   of the evidence related to supporting a priority date, I

13   think this is an inappropriate vehicle to resolve that

14   dispute.  So to the extent that defendants seem to accept

15   July 6th, 1997 as a date that shouldn't be considered in

16   this case, then this is not the way to go about

17   disqualifying it as the priority date.

18           THE COURT:  Well, but where, where, if ever, did

19   you say anything further about priority dates before the

20   reports that we're talking about other than, and after, the

21   interrogatory response that was quoted?

22           MS. LAWSON:  I think it's made clear in

23   Mr. Hedloy's deposition testimony also discusses July of

24   1997 as the date of conception; and I think the

25   understanding that, that is also relevant to the priority

1   date is evidenced by what is included in defendants' own

2   expert report.

3                    If you -- I believe Plaintiff's Exhibit B is

4   Dr. Rosing's expert report, and there he identifies that he

5   is aware that Arendi's has identified an earlier priority

6   date.  Similarly, Dr. Lieberman expressly identifies

7   December of 1997 as his understanding of Arendi's position

8   regarding priority date.

9                    So I think it was made clear through our

10  interrogatory responses and through Mr. Hedloy's deposition

11  testimony that not only was Arendi referring to July of

12  1997 as part of its conception story but additionally

13  intended to rely on it in making an argument regarding

14  priority date.

15                   THE COURT:  But in the interrogatory response,

16  the only thing you said about priority date was September

17  3rd, 1998; isn't that right?

18                   MS. LAWSON:  Yes, that's correct, Your Honor.

19                   THE COURT:  And you never amended that or

20  supplemented that response to the interrogatory; correct?

21                   MS. LAWSON:  Yes, that is correct, Your Honor.

22  That the interrogatory itself was never supplemented or

23  amended, but I believe Arendi's position became clear,

24  throughout the course of fact discovery as XYZ experts

25  relying on the summer of 1997 as their priority date.

1          THE COURT:  But at every moment in that in

2     assuming discovery, that is, following the response to

3     Interrogatory No. 9, weren't the defendants entitled to rely

4     on your statement that you were only claiming a priority

5     date of September 1998?

6          MS. LAWSON:  I believe that, again, as we

7     identified in that Interrogatory No. 9 response, that it

8     wasn't, it was not merely limited to September of 1998.

9          And further, I think whether or not the

10    defendants now are claiming that that is the only thing they

11    relied on, again, I think what we can look to, what they --

12    what was actually in the expert reports in identifying the

13    scope of the prior art.  Even if we look, for example, to

14    Dr. Fox's report, it's evident from the scope of the

15    priority considered that they did not limit themselves

16    strictly to a priority date of September 8th, 1998.

17         THE COURT:  There is nothing in interrogatory,

18    though, that expressly at least says we're reserving the

19    right to claim an earlier priority date for one or more

20    patents-in-suit.  Nothing to that effect; right?

21         MS. LAWSON:  I think to the extent that our

22    objections in the interrogatory state that this is also an

23    issue that will be, is better reserved for expert reports

24    and expert discovery, I think to that extent we do raise

25    an objection and which also -- defendants that the, the

1    priority date is subject to the December 1997 date we

2    identified.

3              THE COURT:  I think you also objected to the

4    term "priority date" as being vague in your interrogatory

5    response.

6              Is that -- I guess help me understand that

7    objection.  Is that one you still stand on?

8              MS. LAWSON:  Your Honor, could you repeat the

9    question?

10             THE COURT:  Sure.  I believe one of your general

11   objections or one of your objections to the interrogatory

12   was that priority date has at a term might be itself vague.

13   Does that have any impact here?

14             MS. LAWSON:  No, Your Honor.  I think only to

15   the extent that we provided for response based on the

16   Norwegian patent, priority date based on the Norwegian

17   patent based on what we understood priority date meant.

18             Again, I think the identification of priority

19   date as potentially as vague supports our position that we

20   were leaving open the reliance on the earlier conception

21   date as referenced in the report.

22             THE COURT:  I think the motion also relates to

23   a document that as I understand it the inventor only found

24   very recently.  Why shouldn't we strike that document?

25   Shouldn't he have found that document much sooner in the

1   course of this case?

2           MS. LAWSON:  Yes, Your Honor.  We, Arendi

3   recognizes that that document was provided after the close

4   of fact discovery.  However, again, we believe it's not only

5   consistent with the 19 -- July 1997 conception and priority

6   date we have identified, but in addition, it's not the only

7   piece of evidence that is cited by Dr. Sacerdoti in his

8   report.

9           And, additionally, that Arendi has not --

10  this is not a matter of gamesmanship or that this was an

11  inadvertent, inadvertent situation that the document was not

12  produced earlier in the case.

13          But we received no benefit from withholding this

14  core document or not providing it earlier.  And to the

15  extent that it doesn't change Arendi's fundamental position,

16  we don't believe that it should be, should be struck.

17          THE COURT:  Okay.  Is there anything else you

18  want to add?

19          MS. LAWSON:  That's all, Your Honor.

20          THE COURT:  Okay.  Thank you.

21          Mr. Unikel, do you want to respond?

22          MR. UNIKEL:  Yes, a few brief responses.  Thank

23  you, Your Honor.

24          First is the interrogatory response itself is

25  declarative, it is unequivocal, and it's unambiguous.

1          And if we're not permitted to rely on such

2    statements in interrogatory responses, then they become

3    effectively meaningless.

4          Here, this is the priority date we understood at

5    all times them to be claiming all the way up through expert

6    reports, which is why our experts did in fact use September

7    3rd, 1998 as the priority date, consistent with their

8    declaration which was never amended.

9          Second, I just want to, I want to disagree with

10   the point at the outset of opposing counsel's argument, we

11   the defendants do not accept July 6th, 1997 as a properly

12   corroborated conception date, nor do we believe we were ever

13   put on notice of such a date, certainly not that specific

14   date at any time before the expert report.

15         Still to this day, we haven't seen any evidence

16   that July 6th, 1997 was in fact the conception date for any

17   purposes.

18         But what I was saying in my initial presentation

19   is I believe that to the extent that this is just the date

20   that is going to be thrown out as part of the general

21   conception story and context, that I wouldn't necessarily

22   have any issue with them using that date in their discussion

23   so long as it was not a date that was being used to

24   disqualify prior art or to create a new priority date which

25   was counter to what they had declared for all purposes in

1    the interrogatory response.

2              And the last point I will make, Your Honor, is I

3    cannot speak to any other experts reports, but Dr. Fox, who

4    was Google's and Motorola's expert, nowhere recognizes in

5    any way that there is a different possible conception or

6    priority date here other than September 3rd, 1998.

7              He discusses some of the early products which,

8    which had certain features that are covered by the patent,

9    but nowhere did he assume or deal with the notion that they

10   might change the priority date from September 3rd, 1998 to

11   something earlier in 1997.

12             So that is certainly just is not true for

13   Dr. Fox I can say firsthand.

14             And as a result, we believe that again the right

15   answer here is to preclude any opinion that would establish

16   anything earlier than September 3rd, 1998 as an invention

17   date or conception date for purposes of priority under 102(a).

18             THE COURT:  Okay.  Thank you very much.  I thank

19   both counsel for the argument on this one.

20             On this motion, which is joint I think by all

21   defendants, I'm granting the motion to strike.

22             What do I mean?

23             The plaintiffs are not going to be permitted to

24   proceed on a theory of a priority date prior to September

25   3rd, 1998 or really anything other than September 3rd, 1998,

which was the one and only expressly disclosed priority date

in response to a clear interrogatory, Interrogatory No. 9.

The defendants were entitled, from at least every

moment after they got that clear response to Interrogatory No.

9, to proceed with the remainder of discovery in forming their

case on the belief and competent knowledge that the priority

date the plaintiffs were seeking to establish was September

3rd, 1998.

The plaintiffs will be permitted, I think

without objection but will be permitted to as part of the

general invention story, should they want to put that on at

trial, to use the specific date of July 6th, 1997 as part

of the discussion of the invention story but not for the

purposes of arguing for or suggesting in any way that there

is a priority date that is anything other than September

3rd, 1998, and certainly it goes with that not for any

purpose of trying to disqualify certain prior art that the

defendants are relying on.

In reaching these conclusions, I've considered

of course the arguments and all the materials considered,

and I considered the *Pennypack* Factors at all points in my

mind to the same direction.

I don't know that more needs to be said about

the document, but the document should have been found

sooner.  It may be moot at this point given my rulings on

1    the priority date but I am also persuaded that it would be

2    wrong to permit that document to come into this case in the

3    context plaintiffs wish at this stage.  So I am granting the

4    motion.

5                Mr. Unikel, any questions on behalf of

6    defendants?

7                MR. UNIKEL:  No, Your Honor.  Thank you.

8                THE COURT:  And Ms. Lawson, anything?

9                MS. LAWSON:  No, Your Honor.

10               THE COURT:  Okay.  All right.  I believe that

11   covers all the motions.  Thank you very much.  And we'll be

12   in recess.  Bye-bye.

13               (The attorneys respond, "Thank You, Your Honor.")

14               (Telephone conference ends at 11:45 a.m.)

15

16       I hereby certify the foregoing is a true and accurate
     transcript from my stenographic notes in the proceeding.

17

18                           /s/ Brian P. Gaffigan
                           Official Court Reporter
19                           U.S. District Court

20

21

22

23

24

25